T.C. Memo. 2017-188

UNITED STATES TAX COURT

PATRICK JOSEPH SIMONELLI AND JACQUELINE CARLIN SIMONELLI,
Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17301-14.                    Filed September 26, 2017.

Patrick Joseph Simonelli and Jacqueline Carlin Simonelli, pro sese.

Daniel J. Bryant, Thomas R. Mackinson, and Michael Skeen, for

respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, Judge:  With respect to petitioners' Federal income tax for 2011

and 2012, the Internal Revenue Service (IRS or respondent) determined

[*2] deficiencies and accuracy-related penalties under section 6662(a)[1] as follows:

| Year | Deficiency | Penalty |
|------|-----------|---------|
| 2011 | $12,669 | $2,534 |
| 2012 | 6,281 | 1,256 |

The issues for decision are whether petitioners: (1) are entitled to deduct expenses on Schedules C, Profit or Loss From Business, attributable to a law practice that petitioner Patrick Simonelli allegedly conducted with his son Antonio; (2) are entitled to deduct rental real estate losses in excess of those respondent allowed, which depends on whether petitioner Jacqueline Simonelli qualified as a "real estate professional" during 2011 and 2012; and (3) are liable for accuracy-related penalties. We resolve all issues in respondent's favor.

## FINDINGS OF FACT

Petitioners refused to stipulate any facts or documents before or at trial. The Court made absolute its prior order filed January 28, 2016, requiring them to show why respondent's proposed facts should not be accepted as established for purposes of this case. See Rule 91(f)(2). The Court has deemed some facts stipu-

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect for the tax years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[*3] lated; the rest of the facts are found on the basis of the trial testimony and the exhibits admitted at trial. Petitioners resided in California when they filed their petition.

A.    The Alleged Business

Petitioners' son Antonio graduated from law school at the University of California, Berkeley in 2009. He was admitted to the Utah bar later that year. In May 2011 he enrolled in an LL.M. program in Singapore; this program was jointly operated by the National University of Singapore (NUS) and New York University. He was allegedly awarded an LL.M. degree in August 2012, but petitioners supplied no documentary evidence to substantiate that.

During his spring semester at NUS Antonio did part-time work for Consilium Law Corp. (Consilium), a Singapore law firm. He earned $500, all of which he deposited into his personal bank account and used to pay his living expenses. He allegedly received an offer of full-time employment from Consilium in early 2012. But this offer was apparently rescinded in June 2012, and he returned to the United States later that month.

Petitioners paid Antonio's LL.M. tuition as well as travel and other expenses he incurred during his year in Singapore. Antonio's alleged goal in attending the LL.M. program in Singapore was to practice law there after he graduated. He

[*4] hoped that he might do this with assistance from his father, who was trained as a lawyer and had retired from the Department of Housing and Urban Development in 2007.

Although the idea of Patrick's and Antonio's practicing together was perhaps a dream, petitioners treated it as a reality for purposes of claiming tax deductions for Antonio's tuition and expenses. To that end they took the position that Patrick and Antonio had practiced law as a partnership in Singapore and in California during 2011 and 2012. There is no evidence that Patrick or Antonio was licensed to practice law in either jurisdiction. And there is no evidence that Patrick ever set foot in Singapore.

Their purported legal work consisted of unspecified tasks relating to two lawsuits in which Antonio was the plaintiff. The first was a personal injury suit involving a 2004 automobile accident that left Antonio partially disabled. The second was a lawsuit that Antonio subsequently filed against the Regents of the University of California alleging discrimination on the basis of disability. The latter suit was handled by an outside law firm until sometime in 2009, when the U.S. Court of Appeals for the Ninth Circuit affirmed a 2007 jury verdict against Antonio. Antonio thereafter filed, allegedly with his father's assistance, a petition for certiorari to the U.S. Supreme Court in April 2010. When that petition was de-

[*5] nied in June 2010, Antonio filed in fall 2010, allegedly with his father's assistance, a petition for rehearing which (unsurprisingly) was also denied.

Petitioners introduced no evidence that Patrick practiced law or engaged in any law-related activity after 2007, apart from his alleged provision of assistance to Antonio as described above. There is no evidence that Patrick or Antonio held himself out as a lawyer or had any clients during 2011 or 2012. The two lawsuits in which Antonio was the plaintiff appear to have ended before 2011, apart from one remaining insurance claim. There is no evidence that Patrick or Antonio worked on any other legal matters during 2011 or 2012.

Apart from the two lawsuits discussed above, Antonio allegedly worked at various times on three other matters: (1) the insurance claim relating to his 2004 automobile accident, which was ultimately settled in 2013; (2) an Alaska case involving a deceased uncle, for which Antonio allegedly acted as co-counsel during 2014 and 2015; and (3) a pro bono case in Utah in 2013. There is no credible evidence that Patrick performed meaningful services in connection with any of these matters or (if he did) that he performed such services during 2011 or 2012. There is no evidence that Antonio sought fees in any of these matters or (if he did) that they were received during 2011 or 2012.

**[\*6]**  Neither Patrick nor Antonio maintained a separate bank account for the purported law practice.  They maintained no books and records in connection with it.  They had no written business plan, no marketing plan, and no potential client list.

B.    Real Estate Activity

In 1993 petitioners purchased a vacation home in Carmel, California, about 140 miles from their primary residence in Ross, California.  During 2011 and 2012 petitioners used this property primarily as a vacation retreat on weekends and holidays and during summer periods.  They also rented it out occasionally.

Mrs. Simonelli took charge of any rental activities.  She hired, and lightly supervised, various service providers to care for the property, including a cleaning person, a gardener, and a repairman.  She prepared rental agreements, met with prospective tenants, and acted as a property manager.  And she attended Carmel city council meetings to discuss proposals for residential land development near petitioners' home.

Mrs. Simonelli allegedly devoted 913 hours in 2011 and 850 hours in 2012 to the Carmel property.  In an effort to substantiate these hours petitioners provided at trial three wall calendars and one monthly planner.  It is unclear when these documents were created.  They do not describe specific tasks or show hours devoted specifically to the real estate activity.  Rather, most of the time

**[*7]** entries show the personal activities in which Mrs. Simonelli engaged during the day.

In an effort to fill gaps in the calendars and the monthly planner, petitioners attached to their post-trial brief a spreadsheet allegedly based on those documents. (We treated this spreadsheet not as evidence, but as a component of petitioners' post-trial brief). Many entries on this spreadsheet show exclusively personal activities, e.g., time spent driving to and from the Carmel property for vacations and cleaning the property after personal use. The 2011 spreadsheet has entries totaling 43 hours for grocery shopping, 18 hours for haircuts, 8 hours for computer classes, and 197 hours for tax return preparation. The 2012 spreadsheet has entries totaling 18 hours for grocery shopping, 18 hours for haircuts, and 315 hours for tax return preparation. The spreadsheets show many hours for attending Carmel city council meetings, but this activity was also largely personal, motivated by petitioners' desire to prevent residential development near their home.

C.    IRS Examination

Petitioners filed timely Forms 1040, U.S. Individual Income Tax Return, for 2011 and 2012. They included in each return a Schedule C for the purported law practice. For 2011 they reported zero gross receipts and total expenses of

[*8] $32,083, for a net loss of $32,083.  The expenses, mainly attributable to tuition for Antonio's LL.M. program, were as follows:

| Expense | Amount |
|---|---|
| Depreciation | $2,022 |
| Travel | 3,516 |
| Other | 22,847 |
| Home office | 3,498 |

For 2012 petitioners reported on Schedule C zero gross receipts and total expenses of $32,224, for a net loss of $32,224.  The reported expenses, again attributable mostly to Antonio's studies in Singapore, were as follows:

| Expense | Amount |
|---|---|
| Depreciation | $120 |
| Travel | 4,970 |
| Other | 22,802 |
| Home office | 3,311 |

Petitioners also included in each return a Schedule E, Supplemental Income and Loss, for the Carmel property.  For 2011 they reported rental income of $19,250, expenses of $51,564, and a net loss of $57,100.  For 2012 they reported rental income of $30,000, expenses of $45,408, and a net loss of $25,000.  (For neither year did they explain their math.)

The IRS selected petitioners' 2011 and 2012 returns for examination.  It disallowed all of the Schedule C deductions on the ground that Mr. Simonelli was not

[*9] engaged in the trade or business of practicing law during 2011 or 2012 and (alternatively) for lack of substantiation. The IRS recharacterized portions of the claimed home office expense deductions as itemized deductions and allowed them as such.

With respect to the Carmel property the IRS concluded that petitioners had actively participated in a rental real estate activity and allowed loss deductions of $9,721 and $15,931 for 2011 and 2012, respectively, under section 469(i).[2] The IRS treated the balance of the claimed losses as nondeductible passive losses on the ground that petitioners were not engaged in a "real property business" within the meaning of section 469(c)(7). The IRS also determined accuracy-related penalties. It issued petitioners a timely notice of deficiency setting forth these adjustments, and they timely petitioned this Court.

## OPINION

The IRS' determinations in a notice of deficiency are generally presumed correct, and taxpayers bear the burden of proving them erroneous. Rule 142(a);

---

[2]Section 469(i)(1), (2), and (3) allows an individual who actively participates in a rental real estate activity to deduct against ordinary income up to $25,000 of losses from that activity if adjusted gross income (AGI) is less than $150,000. Section 469(i)(3) requires a gradual phase-out of this deduction once AGI exceeds $100,000. Because petitioners' AGI, as recomputed by the IRS after disallowing the Schedule C losses, exceeded $100,000, their allowable Schedule E losses were partially phased out.

**[\*10]** <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  Taxpayers bear the burden of proving their entitlement to deductions allowed by the Code and of substantiating the amounts of claimed deductions.  <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), Income Tax Regs.  Petitioners do not contend, and they could not plausibly contend, that the burden of proof should shift to respondent under section 7491(a) as to any issue of fact.  The burden of proof thus remains on them.

A.     <u>Schedule C Expenses</u>

Deductions are a matter of legislative grace.  Taxpayers bear the burden of proving that reported business expenses were actually incurred and were "ordinary and necessary."  Sec. 162(a); Rule 142(a).  Taxpayers also bear the burden of substantiating expenses underlying their claimed deductions by keeping and producing records sufficient to enable the IRS to determine the correct tax liability.  Sec. 1.6001-1(a), (e), Income Tax Regs.  The failure to keep and present such records counts heavily against taxpayers' attempted proof.  <u>Rogers v. Commissioner</u>, T.C. Memo. 2014-141, 108 T.C.M. (CCH) 39, 43.

The first issue we must decide is whether Patrick was engaged in the trade or business of practicing law during 2011 or 2012.  To be engaged in a "trade or business," the taxpayer must perform the activity with continuity and regularity

**[\*11]** and his primary purpose for doing so must be for income or profit. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). To prove continuity and regularity the taxpayer generally must show "extensive business activity over a substantial period as opposed to a onetime venture or investment." Jafarpour v. Commissioner, T.C. Memo. 2012-165, 103 T.C.M. (CCH) 1880, 1884. The taxpayer must also establish that he "engaged in the activity with 'the predominant, primary or principal objective' of realizing an economic profit independent of tax savings." Giles v. Commissioner, T.C. Memo. 2006-15, 91 T.C.M. (CCH) 684, 688 (quoting Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), aff'g T.C. Memo. 1991-212).

Petitioners have not established that Patrick was engaged, individually or in partnership with Antonio, in the practice of law during 2011 or 2012. There is no evidence that he or Antonio was licensed to practice law in either Singapore or California. They had no clients and earned no fees. There is no evidence that they created a law partnership, engaged in marketing activities, or held themselves out as lawyers during the years at issue. The only legal matters that appeared on their radar screens before 2013 were the two lawsuits in which Antonio was the plaintiff, and virtually all activity in those cases had occurred before 2011. To the extent that Patrick devoted any attention to these matters, there is no evidence that he

[*12] acted as a lawyer advising a client rather than as a father assisting a son. In any event, the occasional provision of advice does not amount to "extensive business activity over a substantial period." Jafarpour, 103 T.C.M. (CCH) at 1884.

Antonio received $500 from Consilium for part-time work in Singapore, but that income was not earned in a law practice in which Patrick engaged. Patrick never visited Singapore, and he did not report on Schedule C, as income from his alleged law practice, the $500 that Consilium paid Antonio. Most of the claimed Schedule C expenses were attributable to tuition for Antonio's LL.M. program. By paying their son's tuition, petitioners were defraying, not a business expense, but a "personal, living, or family expense[]." Sec. 262(a).

Even if we were to find that Patrick's law-related activities were regular and continuous during 2011 and 2012, petitioners have not established that he engaged in these activities with the principal objective of making a profit. See Giles v. Commissioner, T.C. Memo. 2005-28, 89 T.C.M. (CCH) 770, 775. If an activity is not engaged in for profit, and if the expenses are not otherwise deductible, no deduction attributable to that activity is allowed in excess of gross income derived from it (in this case, zero for each year). See sec. 183(b).

**[\*13]** The regulations set forth a nonexclusive list of nine factors relevant in ascertaining whether a taxpayer conducts an activity with the principal purpose of earning a profit. Sec. 1.183-2(b), Income Tax Regs.; see Mack v. Commissioner, T.C. Memo. 1988-187, aff'd, 892 F.2d 1046 (9th Cir. 1989). There is no need to parse these factors exhaustively here. It is obvious that Patrick did not intend to make a profit: He engaged in no meaningful legal activity; he had no clients and charged no fees; he had no marketing or business plan; he maintained no business records; and he earned no gross receipts.

"The presence of personal motives in carrying on an activity may indicate that the activity is not engaged in for profit." Sec. 1.183-2(b)(9), Income Tax Regs. At best, Patrick's law-related activity during 2011 and 2012 consisted of advising Antonio about lawsuits in which Antonio hoped to recover money as a plaintiff. It is obvious that Patrick had personal and family motives for assisting his son in this way. And the purported law practice was personal in another sense: It was a device by which petitioners sought to claim tax deductions for defraying Antonio's nondeductible tuition and travel expenses.

In sum, we find and hold that Patrick during 2011 and 2012 did not engage, individually or in partnership with Antonio, in the trade or business of practicing law. Even if his law-related activities were thought "regular and continuous," they

[*14] were "not engaged in for profit" within the meaning of section 183(a).  Because he derived no gross income from his purported legal activity during 2011 or 2012, he is not entitled to any deductions other than those respondent has allowed as itemized deductions.[3]

B.    Schedule E Losses

Section 469(a) generally disallows a current deduction for a "passive activity loss" incurred by an individual.  A "passive activity" includes an activity involving a trade or business in which the taxpayer does not "materially participate" and "any rental activity" regardless of whether the taxpayer materially participates.  Sec. 469(c)(1), (2), and (4).

Petitioners claimed for 2011 and 2012, respectively, rental real estate loss deductions of $57,100 and $25,000, of which respondent allowed $9,721 and $15,931 under section 469(i).  With regard to the disallowed portions of their deductions, petitioners urge that during 2011 and 2012 Mrs. Simonelli was a real estate professional, i.e., a taxpayer in a "real property business" within the mean-

---

[3]Even if Patrick were thought to have engaged in a trade or business for profit during 2011 and 2012, petitioners provided no documentary evidence to substantiate the principal expenses of that supposed business, namely, the tuition charged for Antonio's LL.M. program or the travel expenses he incurred.   We would therefore deny the bulk of the claimed expenses on this alternative basis. See sec. 1.6001-1(a), (e), Income Tax Regs.

**[\*15]** ing of section 469(c)(7).  That section provides that the rental real estate activity of a real estate professional is not per se passive.  See Kosonen v. Commissioner, T.C. Memo. 2000-107, 79 T.C.M. (CCH) 1765; sec. 1.469-9(b)(6), (c)(1), Income Tax Regs.  If a real estate professional materially participates in a rental real estate activity, that activity is treated as nonpassive, and the section 469(a) disallowance does not apply.  See Shiekh v. Commissioner, T.C. Memo. 2010-126; Fowler v. Commissioner, T.C. Memo. 2002-223; sec. 1.469-9(e)(1), Income Tax Regs.

To qualify as a real estate professional, a taxpayer must (among other things) "perform[] more than 750 hours of services during the taxable year in real property trades or businesses in which * * * [she] materially participates."  Sec. 469(c)(7)(B)(ii).  For taxpayers filing a joint return, only one spouse need qualify under this rule.  Sec. 469(c)(7)(B).  The focus of the parties' dispute is whether Mrs. Simonelli met the 750-hour requirement for either year.

A taxpayer may substantiate the required 750 hours of participation by any reasonable means, but a "ballpark guesstimate" will not suffice.  Moss v. Commissioner, 135 T.C. 365, 369 (2010); sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).  In the absence of "[c]ontemporaneous daily time reports, logs, or similar documents," the extent of participation may be

[*16] established by "the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on appointment books, calendars, or narrative summaries." Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., supra.

Petitioners' reported losses were attributable to their Carmel vacation home. Petitioners rented out that property only six times during 2011 and 2012, whereas they used it for vacation purposes on more than 30 occasions, often for a week at a time. These numbers, standing alone, suggest that the bulk of the time Mrs. Simonelli devoted to that property was personal, not tenant-related.

Mrs. Simonelli admitted that she did not keep accurate contemporaneous records of her rental real estate activities. The calendars and monthly planner petitioners submitted at trial do not show hours devoted specifically to tenant-related tasks. The spreadsheet that petitioners attached to their post-trial brief, which was prepared after trial, confirms that most activities connected to the Carmel home were personal. Although this spreadsheet does not constitute evidence, it does include admissions by petitioners about how their time was spent.

Most entries on the spreadsheet are round-number estimates showing no start or stop times. The spreadsheet shows that petitioners spent many hours driving to and from the Carmel house for weekend and vacation trips, cleaning the

[*17] property at the end of a trip, and performing miscellaneous yardwork. Many entries--for grocery and furniture shopping, haircuts, and computer classes--have no rental connection whatsoever. The spreadsheet shows a total of 512 hours spent on tax return preparation; these hours are clearly inflated (petitioners hired a tax return preparer for both years), and petitioners made no effort to show what percentage of their tax return preparation time could reasonably be allocated to their Schedule E activity. The spreadsheet shows that Mrs. Simonelli spent many hours discussing real estate development at Carmel city council meetings. But petitioners did not establish that these efforts were tenant-related as opposed to personal endeavors designed to preserve the tranquillity of their vacation home.

In sum, we find that petitioners have not provided credible evidence regarding the number of hours Mrs. Simonelli devoted to rental real estate activities during 2011 and 2012. Even if we took plausible tenant-related entries at face value, petitioners would not get close to the required 750 hours for either year. We accordingly hold that petitioners have failed to carry their burden of proving that Mrs. Simonelli was a real estate professional under section 469(c)(7). We will accordingly sustain respondent's determination to disallow the bulk of petitioners' claimed Schedule E loss deductions.

**[*18]** C.     Accuracy-Related Penalty

The Code imposes a 20% penalty upon the portion of any underpayment of tax attributable to "[n]egligence or disregard of rules and regulations" or "[a]ny substantial understatement of income tax." Sec. 6662(a) and (b)(1) and (2). "Negligence" includes "any failure to make a reasonable attempt to comply" with the internal revenue laws. Sec. 6662(c). "Negligence" also includes any failure to keep adequate books and records or to substantiate items properly. Sec. 1.6662-3(b)(1), Income Tax Regs.; see Olive v. Commissioner, 139 T.C. 19, 43 (2012), aff'd, 792 F.3d 1146 (9th Cir. 2015). An individual's understatement of income tax is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Sec. 6662(d)(1)(A).

Under section 7491(c) the Commissioner bears the burden of production with respect to the liability of any individual for any penalty. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). We find that respondent has satisfied his burden of production as to negligence by showing that petitioners did not maintain adequate books and records with respect to either the purported law practice or the rental real estate activities. See sec. 1.6662-3(b)(1), Income Tax Regs. What few records they did provide were cobbled together shortly before trial and lacked credibility.

**[\*19]**  Section 6664(c)(1) provides an exception to the imposition of the accuracy-related penalty if the taxpayer establishes that there was reasonable cause for, and that he acted in good faith with respect to, the underpayment.  The decision as to whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances.  See sec. 1.6664-4(b)(1), Income Tax Regs.  Circumstances that may signal reasonable cause and good faith "include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer."  Ibid.

Petitioners have failed to establish that they made a good-faith effort to determine their Federal income tax liabilities correctly.  Although they hired a tax return preparer, they do not assert reliance on that person as a defense to the penalties.  See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); sec. 1.6664-4(b)(1), (c), Income Tax Regs.  Petitioners provided no credible evidence that Patrick practiced law during 2011 or 2012.  Rather, the evidence shows that the supposed law practice was a device to claim tax deductions for Antonio's (otherwise nondeductible) LL.M. tuition and travel expenses.  With respect to the claimed Schedule E loss deductions, petition-

**[*20]** ers kept no contemporaneous records, and their trial submissions were wholly lacking in credibility.

We accordingly conclude that all of the underpayments are attributable to negligence. Alternatively, if the Rule 155 computations show that the understatements of income tax for 2011 and 2012 exceed the greater of $5,000 or 10% of the amounts required to be shown on the respective returns, we conclude that those underpayments are attributable to substantial understatements of income tax for which reasonable cause has not been shown.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.